Filed 6/28/21 P. v. Parker CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. KEDRICK DESHAUN PARKER, Defendant and Appellant. | B303463 (Los Angeles County Super. Ct. No. MA070440) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge. Affirmed.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Blythe J. Leszkay and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Kedrick Parker appeals from a judgment entered after a jury found him guilty of human trafficking and pimping an adult female (A.C.), human trafficking and pimping a minor female (W.S.), failure to register as a sex offender, and dissuading a witness (A.C.) from testifying. The trial court sentenced him to 34 years and eight months in prison. He contends the trial erred (1) in admitting into evidence at trial A.C.'s preliminary hearing, testimony based on a finding she was unavailable as a witness; (2) in admitting into evidence at trial for their truth A.C.'s statements to law enforcement under the spontaneous statement and forfeiture by wrongdoing hearsay exceptions; (3) not instructing the jury sua sponte on misdemeanor false imprisonment, arguing it is a lesser included offense of the human trafficking count involving A.C.; and (4) in admitting into evidence at trial testimony from W.S. and a detective regarding W.S.'s age, over Parker's objection that the testimony lacked foundation. We reject Parker's contentions and affirm the judgment.

## BACKGROUND

### I. Procedural History of Case

An amended information charged Parker with human trafficking A.C. (Pen. Code, § 236.1, subd. (a); count 1); pimping A.C. (Pen. Code, § 266h, subd. (a); count 2); pimping W.S., aka R.C. (Pen. Code, § 266h, subd. (a); count 3); failure to register as a sex offender (Pen. Code, § 290, subd. (b); count 4); possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); count 6);[1] possession of ammunition by a person prohibited (Pen. Code,

---

[1] The amended information did not include a count 5.

2

§ 30305, subd. (a)(1); count 7); human trafficking a minor (W.S.) for a commercial sex act (Pen. Code, § 236.1, subd. (c)(1); count 8); and dissuading a witness from testifying (Pen. Code, § 136.1, subd. (a)(1); count 9). The amended information also alleged Parker had a prior serious felony conviction, a burglary (Pen. Code, § 459), within the meaning of the "Three Strikes" law (Pen. Code, §§ 667, subds. (b)-(j) & 1170.12, subd. (b)).

At Parker's first trial in July 2018, a jury found him guilty of dissuading A.C. from testifying (count 9) and found him not guilty of the firearm and ammunition offenses (counts 6 & 7). The jury could not reach a verdict on counts 1 through 4 and 8, and the trial court declared a mistrial as to these counts. On appeal, Parker does not challenge his conviction for dissuading a witness.

The prosecution retried Parker on counts 1 through 4 and 8 in a second trial that commenced in November 2019. As discussed more fully below in the Discussion section of this opinion, after holding a due diligence hearing, the trial court admitted into evidence A.C.'s preliminary hearing testimony (summarized below), finding she was unavailable as a witness and the prosecution demonstrated due diligence in attempting to secure her attendance at trial. The court also admitted into evidence the entirety of A.C.'s statements to law enforcement (two recorded interviews, summarized below) under the hearsay exceptions for spontaneous statements (Evid. Code, § 1240) and forfeiture by wrongdoing (Evid. Code, § 1390), and as impeachment of her preliminary hearing testimony.

Below is a summary of the pertinent facts presented at Parker's second trial.

## II. Prosecution Case

### A. Surveillance of Parker

In 2007, Parker was convicted in Nevada of pandering a minor, conspiracy to pander a minor, and second degree kidnapping. As a result of the pandering convictions, he was required to register as a sex offender in California pursuant to Penal Code section 290. Between late 2010 and May 2016, he registered at the sheriff's station in Lancaster. He often registered as a transient, indicating he did not have an address to include on the registration forms. In or about April 2016, a sex offender registration relief person who worked at the Lancaster sheriff's station became suspicious of Parker's registration because he did not seem homeless, as he was always well-groomed and wore what appeared to be expensive clothing and jewelry. She suspected Parker had violated the statute by failing to resister an address where he lived. She brought her suspicions to Los Angeles County Sheriff's Department Detective Daniel Gore, a member of the department's Human Trafficking Bureau, who would become the lead detective in this case.

Detective Gore discovered that Parker had two vehicles registered to him at an apartment in Quartz Hill. The vehicles were also registered to a woman named Cashmeer Burks, who was the mother of Parker's son, as Gore would later learn. Gore also learned from a postal inspector that Parker received mail at the same address where the vehicles were registered. Beginning on April 18, 2016, Gore conducted a five-day surveillance outside the Quartz Hill apartment. Each night, he observed a black Jaguar—one of the two vehicles registered to Parker and Burks—arrive and park in the assigned space for the apartment. He

4

could not identify the person who exited the Jaguar at night. Each morning, he observed Parker leave in the Jaguar.[2]

Knowing about Parker's pandering convictions, Detective Gore assembled a five-person team from various law enforcement agencies to conduct a rolling surveillance operation to determine where Parker went when he left the Quartz Hill apartment each morning. On June 3, 2016, the team surveilled Parker as he left the apartment in the Jaguar at about 9:40 a.m. Another man was driving the Jaguar, and Parker was in the front passenger seat. They drove to the Sands Motel in Lancaster, a place known to law enforcement for commercial sex activity. Parker and the man exited the jaguar, entered the motel, and returned to the Jaguar with a female later identified as A.C. The team followed the Jaguar as it entered the 14 Freeway, exited the freeway, made a stop, and continued onto Highway 58. Believing the Jaguar was headed to Las Vegas, Nevada, and knowing Parker's criminal history of pandering a minor in Nevada, Detective Gore did not want the Jaguar to cross state lines with the unidentified female in the backseat. Gore instructed the team members ahead of him to conduct a traffic stop.

By the time Detective Gore arrived at the traffic stop, other team members had detained and handcuffed Parker and his male

---

[2] Evidence regarding the five-day surveillance, evidence recovered during a later search of the Quartz Hill apartment, and Burks's trial testimony supported Parker's conviction for failure to register pursuant to Penal Code section 290, subdivision (b) (count 4) because he failed to list the Quartz Hill apartment as his address on his registration form. We need not discuss this evidence further because it is not germane to the issues on appeal.

companion. Gore approached A.C. She appeared confused and angry about the traffic stop. She told him she was an adult (she was in fact 19 years old). He removed her from Parker's view and had her sit in the backseat of his unmarked vehicle. Gore told her about the investigation of Parker, and A.C. began to talk to him. She appeared scared. She said she was "in fear for her family," and Gore did not know what Parker "was capable of." She asked Gore to take her away from the scene. To avoid the appearance that A.C. was a "snitch," Gore handcuffed her to make it look like an arrest. A.C. was in on the ruse.

Just before Detective Gore and A.C. pulled away from the scene of the traffic stop, Gore began recording his conversation with her. A.C. was crying at times as they drove to the station.

## B. A.C.'s statements to law enforcement

At trial, the prosecutor played for the jury audio recordings from A.C.'s June 3, 2016 interviews with Detective Gore, which occurred in the car on the way to the station and at the station. The prosecutor also provided transcripts of the interviews, which were admitted into evidence and are included in the record on appeal.

### 1. Car interview

As the recording began, A.C. was asking Detective Gore to recover her belongings from the Jaguar, including her cell phones. Gore informed another team member that, according to A.C., Parker had taken her identification and Social Security card.[3] As the discussion regarding A.C.'s belongings continued among A.C., Gore, and the other team member, A.C. said, "Get

---

[3] During a search of Parker at the traffic stop, an officer recovered A.C.'s identification and Social Security card from inside Parker's shoe.

me out of here." She was crying as she made the request. She asked Gore if he had told Parker and his male companion that she was being arrested. Gore indicated that they (he and A.C.) would discuss the matter at the station and figure out what to tell Parker about her situation.

A.C. inquired about the nature of Parker's relationship with the mother of his son (Burks). A.C. asked Gore (1) if Burks knew what Parker did (presumably a reference to Parker's criminal activity); (2) if Gore had seen Parker and Burks together at the apartment; and (3) if Parker and Burks were "lovey-dovey" (e.g., holding hands). Later in the interview, A.C. returned to talking about the nature of Parker's relationship with Burks, and she commented, "she [Burks] just couldn't handle him being a pimp."

A.C. told Detective Gore, "the first time I tried to leave [date not specified], I just told him [Parker] I couldn't do this anymore."[4] She explained that the motel in San Bernardino where they were staying was raided by the police, and she decided she wanted to go to Las Vegas. Parker told her he would not be able to see her anymore if she returned to Las Vegas. A.C. told Gore that the weekend before this interview, she received a tattoo with Parker's first name and a crown.[5]

---

[4] At this point in the interview, A.C. did not elaborate on the nature of the situation she was attempting to leave. It is clear from the car interview that A.C. and Gore had discussed the nature of her relationship with Parker before Gore started recording.

[5] Detective Gore testified at trial that it is common for pimps to have their commercial sex workers tattoo themselves in the manner in which A.C. was tattooed.

7

A.C. informed Detective Gore that Parker had "another girl" named Ruby that he picked up and dropped off at an E-Z 8 Motel in Palmdale. According to A.C., Ruby was staying in a room under Parker's name. A.C. believed Ruby was 19 years old.[6] A.C. indicated she (A.C.) was the only girl staying in the room at the Sands Motel (where the law enforcement team began its rolling surveillance that day). She informed Gore that management at the Sands Motel knew Parker was a pimp and that she was a prostitute, but management did not call the police on them.

A.C. said she did not know Parker was required to register as a sex offender. Parker told her he had a pimping and pandering case that arose because another girl "snitched," but the case was closed because the girl "back[ed] out at the last minute."

A.C. informed Detective Gore that Parker had "a girl in Santa Clarita," but A.C. did not know where she was staying. A.C. explained that she (A.C.) was Parker's "bottom bitch," and he did not allow her to be around his other prostitutes because she became jealous of the other girls, and he did not "want [her] to burn off his money" by interfering in his relationship with his other prostitutes.[7]

_____

[6] Detective Gore would later learn that the girl who called herself Ruby is actually named W.S. Evidence presented at trial, over Parker's objection, demonstrated that W.S. was 16 years old at the time Parker brought her to the E-Z 8 Motel for commercial sex work.

[7] During his trial testimony, based on his experience in the Human Trafficking Bureau, Detective Gore described a "bottom bitch" as follows: "She's the number one girl that a pimp has. I

8

A.C. also explained to Detective Gore that she, Parker, and Parker's male companion were driving to Las Vegas before the traffic stop on the day of this interview, because Parker was "supposed to pick-up [sic] some other girl there out there [sic] in Vegas" and bring her back to California. According to A.C., Parker connected with the girls who worked for him through his Facebook account.

Detective Gore asked A.C. how many times Parker had beaten her (based on their discussion before the recording began), and she replied, "Don't get me started." Responding to Gore's inquiry about the reasons Parker beat her, A.C. explained: (1) he was jealous of her communications with her male friends; (2) she did not get along with the other women/girls; and (3) he got mad whenever she tried to leave. A.C. stated that a couple weeks before this interview, Parker "beat [her] up really bad" in a motel parking lot. He pulled out her hair, "threw out" her shoulder, and refused to allow her to go to the hospital for medical care because she had a black eye. She left with a friend, who drove her from Palmdale to Union Station in Los Angeles, so she could return home to Las Vegas. Parker was at Union Station when she arrived. He said, " 'I can't lose you,' " which made her "feel bad," and she went back with him.

A.C. told Detective Gore she was enrolled in college and had missed two weeks of school. She also indicated she might be pregnant by Parker, but she did not want to have a baby with a "pimp" and a "liar." She said she wanted nothing further to do with Parker, asserting: "I wanna give you guys the rest of the

---

guess for better terms, she's a sergeant at arms. She helps groom the girls, but she also helps keep them in line, and she is the right-hand man/woman [sic] to the pimp."

9

information, get you guys out of my hair so I can go back to being normal." She told Gore that Parker "ruined [her] life." She explained that she quit a "good job" working with autistic children to be with Parker. She thought they were going to move into an apartment together that summer, and he was going to tell Burks about her. He had a good relationship with her family and did not want them to know he was her pimp; in front of them, he acted like her boyfriend.

### 2. Station interview

Once at the station, Detective Gore resumed his recorded interview of A.C. in a conference room. Gore asked A.C. how she first met Parker. She explained that she had a boyfriend when Parker first contacted her through Facebook in or around the beginning of 2016. Parker knew her ex-boyfriend. After she and her boyfriend broke up, she and Parker began communicating more frequently. On March 16, 2016 (two and a half months before this interview), Parker visited A.C. in Las Vegas where she lived. They became intimate.

A.C. stated that initially she "didn't really catch on" that Parker was a pimp; the indications were "subliminal." She explained that when she was 16 years old, she "was forced into a situation . . . where [she] had to prostitute." When Parker "found out about it," he indicated, " 'Okay. Well, you did it before, you can do it again.' " He asked her to return with him to California and work for him as a prostitute. She agreed. He did not want her to work for him in Las Vegas because there was a "crack down on prostitution in Vegas," and her family lived in Las Vegas, and they would likely figure out what she was doing. A.C. stated her father was a well-known drug and human trafficker, who would "kill" Parker if he found out Parker was her pimp.

10

When they arrived in California, Parker took her immediately to a cheap motel and posted an ad for her services on Backpage.com the same night. He indicated she could "catch more dates" and they would "have more money" if she stayed at cheap motels. Parker took all the money she earned from prostitution—and any other money she happened to have—so she "wouldn't have the opportunity to leave."

A.C. worked out of several different motels. Parker set the prices she charged. He also established a code system so he could monitor the progress of her dates. She texted him the number one to indicate the date had arrived at the room and "everything was fine"; the number two to indicate "the tricks are acting-up [*sic*]"; and the number three to indicate the date was over, the customer had left the room, and she had the money. If she texted the number two, Parker would come to the motel room door. When she went on a date at a customer's home, Parker drove her there and waited outside in the car in case something went wrong.

In responding to an inquiry about the amount of sleep she got, A.C. stated, " 'I get to go to sleep when I'm told I can go to sleep.' " She also indicated she "wasn't allowed to stop" working for Parker. Whenever she threatened to leave, Parker would take her phone because he knew she would not leave if she could not call her family.

A.C. stated the last time Parker beat her was a couple days before this interview, and her shoulder, wrist, and head were hurting. Parker threw her into the bathroom, and the cover of the toilet broke when she landed. Detective Gore indicated he noticed a bruise on A.C.'s shoulder, which she confirmed had

resulted from the incident.[8]  She explained she was too "scared" to fight back because whenever she did, Parker would pull her hair and choke her until it was hard for her to breathe.  This particular altercation arose because Parker did not like the way A.C. was acting in front of some girls he had brought to the motel.  As his "bottom bitch," she "wasn't supposed to act [like] that."  A.C. described Parker as a "gorilla pimp."[9]

During the time she worked for Parker, A.C. continued to have a sexual relationship with him.  He told her he was no longer in a relationship with Burks and did not live with her.  He would get angry and hit her when she accused him of living with Burks.  He told her Burks had a boyfriend.  He also told her he lived in his own two-story house.

A.C. told Detective Gore she knew W.S.—known to her as Ruby—was 19 years old because she had seen her identification.  She explained, Parker "takes all of our IDs, that's why I didn't have mine."  A.C. first met Ruby the day before this interview, when they went to a nail shop for a manicure.  Another officer, who was present for some of this interview, asked A.C. if she believed Ruby would talk to law enforcement.  A.C. thought Ruby

---

[8] At trial, Detective Gore testified he did not notice any injuries on A.C. during this interviews.

[9] During his trial testimony, Detective Gore described a "gorilla pimp" as "a type of pimp who uses force[,] fear[,] and violence to get the girls to work for him or to keep them in line, keep them from running away."  He described a "Romeo pimp" as a pimp who uses a romantic relationship and emotional connection to get his prostitutes to continue to work for him.  Gore opined that Parker's relationship to A.C. was that of a Romeo/gorilla pimp.

would talk to them if she (A.C.) was present.  A.C. indicated Ruby might be hesitant to talk because Parker told all the "girls" he would hurt them if he went to jail because they talked to the police.  He told A.C. "he would be forced to hurt [her] and [her] family" if he ever went to jail because of her.  He knew where her family lived, and he had a key to her apartment in Las Vegas.

### C. Law enforcement's rescue of minor W.S. from motel

On June 3, 2016, after Parker's arrest and A.C.'s interviews, Detective Gore and his team went to the E-Z 8 Motel, based on A.C.'s tip about W.S. (aka Ruby).  They found W.S. in a motel room with a customer.  She told them she was 19 years old and gave them a fake name (Ruby C.).  After interviewing her at the station, they released her.

Sometime later, Detective Gore was notified about a minor who had run away from a juvenile placement.  He viewed a photo of W.S., the missing minor, and recognized her as Ruby.  On January 11, 2017, after W.S. was located, Gore interviewed her and confirmed she was a minor.

W.S. testified at trial.  She stated Parker became her pimp a few days before he was arrested.  She was a prostitute before she met Parker.  Her testimony about her relationship with Parker is not pertinent to the issues on appeal, so we do not summarize it here.  W.S. testified that she was born in January 2000, and she was 16 years old when she was working for Parker as a prostitute.  She told Parker she was 19 years old.  She also testified that she was AWOL from a juvenile placement at the time of the events at issue in this case.

13

### D. Parker's jail telephone calls (before preliminary hearing)

At trial, the prosecutor played for the jury audio recordings of the telephone calls Parker made from jail that are summarized below. The prosecutor also provided transcripts of the calls, which were admitted into evidence and are included in the record on appeal.[10]

On June 3, 2016, shortly after he was taken into custody, Parker called Burks from jail. Burks told him she had seen messages on Facebook that A.C. had written about her relationship with Parker. He told Burks he had sex with A.C. a couple times and lied to A.C. about wanting to be in a relationship with her, "for the money to keep flowing" and "to keep her going." He added, "I had to play her . . . all the way to the left to get what I wanted." He described his sexual relationship with A.C. as an "initiation," designed to "to get to [her] mind, body, and soul," so he could get her to do everything he needed her to do. He assured Burks his relationship with A.C. was "nothing personal." He said A.C. was lying about being pregnant. He also said he became angry with A.C. when she had his name tattooed on her body. He told Burks he tried to "get rid of" A.C., but she "would not let [him] get rid of her." In referring to A.C., Parker said: "She's the only one working for me."

---

[10] The prosecutor also presented these calls as evidence at the first trial, and they supported the jury's guilty verdict in that trial on count 9 for dissuading A.C. from testifying. On appeal, these calls are germane to Parker's challenge to the trial court's admission of A.C.'s statements to law enforcement under the forfeiture by wrongdoing hearsay exception.

Parker asked Burks to contact A.C. to find out what she told the police. He wanted to know if A.C. had snitched on him. He told Burks she could call his cell phone because A.C. probably had it. Burks called while she was still on the phone with Parker, and the call to Parker's cell phone went to voicemail. Parker told Burks to send A.C. a Facebook message, telling A.C. the police lied to her, and she should not believe anything the police told her. He also told Burks to lie to A.C. about their relationship and tell A.C. he did not live with Burks. He explained he had told A.C. he lived alone, and he wanted Burks to confirm that, even though it was not true. He stated, "She [A.C.] didn't want to pay my pockets if . . . I was in a relationship. So that's what I told her." He provided his Facebook user name and password to Burks so she could contact A.C. from his account. He instructed Burks to tell A.C., "you [*sic*] supposed to be down for the crown and you ain't down for the crown." He also told Burks to tell A.C. "to hold down the crown."[11] He instructed Burks to deactivate his Facebook account after she contacted A.C.

On June 6, 2016, three days after his arrest, Parker called his mother from jail. He asked his mother to contact A.C. and instruct A.C. to say that she never had sex for money on her dates. He added, "Make sure when you say that just say that, um, all she did was--what she did was just, uh, get massages." He told his mother A.C. was "the main person" and "the reason" he was in jail.

---

[11] During her preliminary hearing testimony (summarized below), which was admitted into evidence at trial, A.C. testified that in the commercial sex industry "the crown" signifies "[h]e is a pimp for me."

On July 4, 2016, two days before A.C. gave her preliminary hearing testimony, Parker again called Burks from jail. Burks told him A.C. had been texting her, stating (1) that the detectives informed her about what Parker was saying about her in his jail calls (that A.C. was "nothing but a hoe, and [he] was making money off her"); (2) that she was going to see Parker and Burks in court and she would "have the last laugh"; and (3) that Parker was not "going to know her baby."

Parker requested Burks make a three-way call to A.C., so Parker could talk to her. Burks initially declined. Parker told her, "If she [A.C.] goes to court, I'm fucked." He added, "I can't afford this bitch to go to court." Burks again declined. Parker told her his life depended on it because he was facing 41 years in prison, and their son would not have a father. He assured her the three-way call could not be recorded. He explained: "I'm going to have to sweet talk this bitch, whatever I have to tell this bitch, to make her not go to court." He repeatedly told Burks he would tell A.C. whatever he had to tell her to make sure she did not go to court, emphasizing, "I can't have her go to court." Burks relented and made the three-way call to A.C.

When A.C. got on the line, she accused Parker of "trying to play [her], explaining she had heard a recording of a jail call and knew Parker did not want her to go to court. She also told Parker she had just now heard him tell Burks, " 'I'm going to do anything, say anything to make her not go to court.' " Parker confirmed he did not want her to go to court. A.C. said he did not care "how [he] hurt [her]." She also told him she was "pregnant with [his] baby." Parker stated the detective was trying to play them against each other and wanted him to testify against her so

16

she would go to jail.[12]  He asserted he "got [her] out of" it by saying she was not involved in prostitution.  She asked him why he was "calling [her] phone non-stop," saying they were "going to be together."  He responded, "I'm going to tell you anything I need to tell you for you not to go to court."  He told her to "be strong" and not "let this white man [the detective] get in between your head [*sic*]."  He claimed he was going to tell her the truth to make her not go to court because his life depended on it, and he would not see his children again if she went to court.  A.C. told him people were calling and texting her, stating that Parker said he was going to hurt her and the baby when he was released from jail.  Parker denied making such statements and told her he "didn't even know [she] was pregnant" (although he and Burks had discussed A.C.'s pregnancy a month before this call).  Before the call ended, Parker implored her to stop believing "all of those lies."

Later the same day, Parker called Burks again and begged her to make another three-way call to A.C.  Burks resisted, but Parker told her he was "never going to see the light of day" if she did not make the call.  He added, "My life is over in two days, if I don't get through to this girl's head."  He threatened to kill himself that night if Burks did not comply.  He told Burks that A.C. was lying about the pregnancy, and he planned to lie to A.C. and tell her whatever "ridiculous, crazy" things would keep her from going to court.  He claimed his heart was with Burks and he was telling her (Burks) the truth.  Burks made the call.[13]

---

[12] A.C. was not charged with any crime in this case.

[13] For her role in these three-way calls, Burks pleaded no contest to a misdemeanor count of dissuading a witness from testifying in violation of Penal Code section 136.1.

When A.C. got on the line, she told Parker she knew he was telling her what she wanted to hear so he could get "out of [his] situation." He said he was lying to Burks and telling Burks what he needed to tell her, so she would let him see his son when he was released from jail. A.C. said she understood why he would do that (lie to Burks so he could maintain a relationship with his son). Parker told A.C. he wanted a future with her (A.C.). She responded that she was not going to go to court. He told her he did not care about that; he cared about his relationship with her. He told her he would probably be released from jail by the time their baby was due.

A.C. reiterated that people were sending her messages, saying that Parker was going to hurt her. He said those people were lying to her. He also told her he knew the detective was lying about what she said in her interviews because he (Parker) never forced her to do anything, including getting tattoos. A.C. assured him she told the detective Parker did not force her to get the tattoos. She told Parker she wanted him to come home. She said the detective was calling her more frequently. Parker told her not to tell the detective anything.

Thereafter, Detective Gore travelled to Las Vegas, picked up A.C., and transported her to Los Angeles for her testimony at Parker's preliminary hearing on July 6, 2016 (two days after the last jail call summarized above). A.C. later told Parker, during a jail call Parker made to her after she gave her preliminary hearing testimony (summarized below), that Detective Gore "popped up at [her] house" at 3:00 a.m. on July 6, 2016, to take her to the preliminary hearing.

18

### E. A.C.'s testimony at preliminary hearing

A.C. did not appear at trial (either the first or the second trial that is at issue here). The prosecution read to the jury at the second trial A.C.'s testimony from the preliminary hearing on July 6, 2016.

A.C. testified that she met Parker around March 2016, and they began a boyfriend/girlfriend relationship. A couple weeks later, she chose to move to Lancaster with him. She suspected he was a pimp, and she told him she "wanted to go make some money." She had "already had two previous pimps," so she "kind of knew what he [Parker] was about." When they arrived in Lancaster, she asked him to take her to a motel, and she booked the room.

A.C. stated she gave Parker "most" of the money she made as a prostitute, performing "sexual favors" for money. She "set [her] own expectations" regarding how much money she wanted to make per day. She posted her own ads on Backpage.com to solicit customers. Parker did not help her post the ads. When she met a customer outside the motel, either Parker drove her to the meeting, or she drove herself in his Jaguar. She explained the numerical text code she used to keep him apprised of the progress of her dates, as described above. Parker provided her physical protection if a customer was causing trouble.

A.C. testified about the tattoos she received after she met him—"his name and a crown." To her, the crown signified that "he was [her] king." As set forth above, she acknowledged that in her industry—commercial sex work—the crown meant: "He is a pimp for me." She stated that she "brought" the tattoo idea to him; he did not ask her to get the tattoos.

19

A.C. denied ever trying to leave Parker. She also denied Parker ever asked her for her identification or Social Security card. She testified she gave those items to Parker willingly because she did not want to carry identification when she was on dates. According to A.C., Parker told her to leave "plenty of times," but she "never wanted to leave."

A.C. acknowledged that Parker was "physical" with her during the time she worked for him as a prostitute. When the prosecutor asked her to be more specific regarding how Parker was physical with her, A.C. responded: "I don't want to go into detail." She acknowledged Parker had hit her in the face with an open hand but denied he had ever hit her in the face with a closed fist. She stated she was not injured when he hit her in the face; she did not receive a black eye. She also denied that Parker ever pulled her hair or threw out her shoulder.

A.C. stated she was not "scared of" Parker. The prosecutor asked her: "Are you worried that by testifying or telling the truth, that the defendant [Parker] will get mad at you?" A.C. responded: "No, because he really wasn't in the wrong. I'm an adult. I make my own decisions." When the prosecutor asked her if she was afraid of anything Parker might do to her because of her testimony, she replied, "I don't know."

A.C. recalled speaking to Detective Gore on the day of Parker's arrest, a month before this preliminary hearing, and she acknowledged she told Gore that Parker had beat her, choked her, and thrown her into a motel bathroom, breaking the toilet. She testified that these statements to Gore were true. She also told Gore that she was required to turn over to Parker all the money she made from prostitution and that she was scared of Parker "[i]n certain situations." She confirmed during her

20

testimony that these were also true statements.  She explained that at the time of Parker's arrest, her fear of Parker was based on information Detective Gore and W.S. were telling her.

A.C. denied telling Gore that Parker grabbed her hair and choked her because she tried to leave.  She asserted she was always free to leave Parker and, on one occasion when she did leave, she "came back by [her] choice."  She stated that although Parker did beat her, choke her, and throw her into a motel bathroom, it was not because she tried to leave.  She also denied telling Gore that Parker forced her to get the tattoo with his name and the crown.  She testified that at the time of the preliminary hearing, she was not afraid of Parker, and she was expecting a child with him.

The prosecutor asked A.C. about the other girl she mentioned to Detective Gore.  A.C. said she did not know the girl well and believed her name was Ruby.  A.C. stated that on a date not specified, she and Ruby went to a nail shop together, then to get food with Parker, and then Parker and A.C. dropped off Ruby at her room at the E-Z 8 Motel in Palmdale.

On cross-examination, A.C. testified that at the time she met Parker in March 2016, she had just stopped working for a pimp.  At that time, she did not typically engage in commercial sex work in Las Vegas because she did not want her family to learn about her prostitution.  In the past, when her family discovered she was working as a prostitute, they disowned her for a time.  Parker attended family events with her in Las Vegas as her boyfriend.  A.C. said she never considered Parker to be her pimp.  She always "considered him [her] boyfriend.  Nothing less; nothing more."  He never forced her to be a prostitute.  She used his telephone number in the ads she posted on Backpage.com for

21

commercial sex work.  She chose to get the tattoos of his name and the crown "to prove to him that [she] wanted to be there for the long run."

Later in her testimony on cross-examination, A.C. qualified the nature of her relationship with Parker, stating:  "I wouldn't call it girlfriend, though, like.  [¶] . . . [¶]  I mean, it was girlfriend, but it was like -- like, there was [*sic*] certain rules behind it."  She explained that she could not go to Parker's house, based on an agreement between Parker and Burks.  Parker did not spend the night with her in the motel rooms or keep any clothes or a toothbrush there, although she and he split the cost of the rooms.  He told her he lived in a two-story house, separate from Burks.

A.C. testified that the arguments and physical altercations she had with Parker arose because she "didn't want him around any other girl."  She stated that when other "girls were around and they were too close, [she] would purposely do things that [she] knew would make him mad" (e.g., ignore him and not "try to help to teach the girls the ropes").  Her arguments with Parker were not related to her work as a prostitute, and she was free to leave him at any time.  She never called the police after one of their physical altercations because she loved him.  She would threaten to call the police when he would walk out on her after an altercation "to make him come back."

A.C. stated she gave Parker her identification and Social Security card when she went on dates in case her customer turned out to be an undercover officer.  At the time of the traffic stop and Parker's detention, he had her identification and Social Security card on his person because she gave it to him.  She explained, "that's just what I do.  I lose things very easily

especially when we're going far distances." On the occasions when they broke up, during the couple months they were together, Parker returned her identification and Social Security card to her.

On redirect examination, A.C. testified that Parker helped her place ads for her commercial sex work on Backpage.com, by taking photos of her and posting the photos on Backpage.com. She identified an ad Parker placed for her and stated that the phone number listed in the ad was hers. She acknowledged she told Detective Gore that Parker posted an ad for her on Backpage.com when they first arrived in Lancaster.

On recross-examination, A.C. testified that it was her idea to post the ads on Backpage.com, and some of the photos she used in the ads were "[f]rom [her] previous pimp." She explained she did not know how to download pictures and place them in an ad, so Parker did that for her.

### F.    Parker's jail telephone call to A.C. after the preliminary hearing

After A.C. testified at the preliminary hearing, Parker called her from jail. At trial, the prosecutor played for the jury the audio recording of the telephone call. The prosecutor also provided a transcript of the call, which was admitted into evidence and is included in the record on appeal.[14]

---

[14] Like the other jail calls summarized above, this call supported the jury's guilty verdict at the first trial on count 9 for dissuading A.C. from testifying, and it pertains to our analysis here of the forfeiture by wrongdoing hearsay exception under which the trial court admitted A.C.'s statements to law enforcement.

Parker told A.C. she did well during direct examination and cross-examination at the preliminary hearing, but she "low-key incriminate[d]" him during redirect examination. A.C. disagreed, informing him that Detective Gore told her: "I don't know if you realize this, but you helped him [Parker] out a lot." Parker said his defense counsel told him A.C. was scared of him. A.C. replied, "I still am." She told Parker she did not know if she wanted to see him when he got out of jail. He asked, "You think I'm going to do something to you?" She responded, "You've told me before."

A.C. accused Parker of lying about not living with Burks. Parker denied he lived with Burks. They argued about the nature of his relationship with Burks and W.S. (aka Ruby).

A.C. indicated she was upset that Detective Gore appeared at her residence at 3:00 a.m. to take her to the preliminary hearing. Parker asserted he would be out of jail if she had not testified, and that is why he told her previously not to testify. A.C. stated there was other evidence, aside from her preliminary hearing testimony, supporting the charges. Parker disputed this. A.C. said they (presumably referring to Detective Gore) told her Parker was found guilty on all charges. Parker explained to her that he had not gone to trial yet, so he could not have been found guilty.

Parker told A.C. she was too easily influenced and scared by "these white people." He stated the police did not know anything until she told them, and she did not have to tell them anything. He complemented and criticized her for her preliminary hearing testimony, stating: "And when you changed it up on me you did a good job. You did a good job when you went to court. You saved a lot of shit by you going to court that time.

But if you never came, I would have got out [*sic*]. They can't find me guilty on no charges if you're not there. I got the right to cross-examine my witnesses against me. And they used you against me. That's what I was trying to tell you."

A.C. said she would not go to court next time. Parker told her: "They're going to subpoena you. You're going to trial if I go to trial. If I decide to go to trial, you're going to be there. And if you don't show up, then you really can go to jail. They gonna [*sic*] send you to jail." Parker indicated A.C. was in this situation (of now having to testify against him before a jury) because she did not listen to him, and she gave the police her grandmother's address in Las Vegas, "and they came and got" her for the preliminary hearing. He said the "worst" that would have happened if she refused to cooperate, "if they even caught" her, is she could have spent a couple days in jail. He told her he would never have testified in court against her, and he would not have answered calls from the police, if she were in jail facing charges. A.C. explained: "They were threatening to subpoena me." Parker responded:

"Okay. Let me tell you what a subpoena is. Right? A subpoena is when they send someone from the court and we say, uh, we need you to appear in court. Right? And then if you don't appear--see this how [*sic*], this how it works. Somebody have to [*sic*] come and see you in person and give you the letter. They can't say, oh, you're subpoenaed to go to court and now you--if you don't come, you're going to get in trouble. They got to [*sic*] give you a paper in your hand face-to-face. If you're not face-to-face with anybody, they can't do nothing [*sic*] to you. You feel me? That means you got to get served. If you're not served, you don't have to show up in court. They can even leave it with your

grandma, but it don't [*sic*] matter.  They can leave it with your mom.  You still don't have to show up because they didn't give it to you in your face hand-to-hand.  You can't get in trouble."

A.C. told Parker she was still "down for [him]."  They discussed the nature of their relationship.  A.C. said things between them "got bad," and that is why she left with China (presumably the woman who drove her to Union Station on the occasion discussed above).  Parker responded:  "You left with China because I let you go."  Parker said A.C. was too easily influenced by other people, including China, Ruby, and "these white people," and that is why he did not "let people come around" her.

Returning to the preliminary hearing, Parker said:  "The whole point of you coming there and you're supposed to testify is [*sic*] to make me not look like a pimp--more like your boyfriend."  They again debated the true nature of their relationship.  A.C. told him she would be with him when he got out of jail until he "entertain[ed] the next bitch."  And he responded that he would be with her until she "entertain[ed] everybody else and these white people too."  Before the call ended, A.C. told Parker, "I love you, daddy," and he said he loved her too.[15]

Detective Gore testified at trial that A.C. left the Lancaster area immediately after the preliminary hearing and relocated to another state because she "was afraid for her safety."  Gore's last contact with her was in or around October 2016, when she called him and told him she was living in Georgia.

_____

[15] Detective Gore testified at trial that pimps "commonly . . . require the girls to call them dad or daddy."

The prosecution also introduced at trial electronic evidence, including text and Facebook messages, which indicated discussions between Parker and his prostitutes (A.C., W.S., and another woman) regarding commercial sex work. These discussions included the amounts to charge for sex acts, information about dates, the posting of Backpage.com ads, and showed use of the numerical text code system for monitoring dates, described above.

## III.   Defense Case

Parker testified at trial in the defense case. We need not set forth the details of his testimony because it is not pertinent to our resolution of the issues on appeal. He denied he was a pimp and said he worked as a photographer, a computer repair person, and a disc jockey. He stated A.C. was his girlfriend from March 16 to May 21, 2016. Thereafter, they were just friends. There was no violence between them, and she was free to leave at any time. During the course of their relationship, he learned from social media that she was a prostitute. She did not work for him as a prostitute, but she did work for him on occasion as a photography assistant.

Parker testified that he met W.S. through Facebook when he advertised the sale of medical marijuana. They smoked marijuana together. He knew she was a prostitute because she asked him if he wanted a date, but she did not work for him as a prostitute. He rented a room for her at a motel at her request because she did not have identification, but she paid for the room.

Parker denied that his text and Facebook messages related to commercial sex work. He attributed some of the text messages associated with his phone to others, stating he had cloned his phone for A.C., and she and others used the cloned phone.

27

## IV. Verdicts and Sentence

The jury found Parker guilty of the retried counts (counts 1-4 & 8) and found the prior conviction allegation to be true as to each count. The trial court sentenced Parker to 34 years and eight months in prison: on count 8 for human trafficking a minor (W.S.) for commercial sex, the upper term of 12 years, doubled to 24 years for the prior strike conviction; on count 1 for human trafficking A.C., two years and eight months (one-third the middle term), doubled to five years and four months; on count 4 for failure to register as a sex offender, eight months (one-third the middle term), doubled to one year and four months; and on count 9 for dissuading a witness from testifying (the guilty verdict in the first trial), the middle term of two years, doubled to four years. The trial court imposed and stayed sentence on counts 2 and 3 for pimping.

In this appeal, Parker challenges his convictions on count 1 for human trafficking A.C., on count 2 for pimping A.C., and on count 8 for human trafficking a minor (W.S.) for commercial sex, based on the contentions discussed below.

## DISCUSSION

## I. Admission of A.C.'s Preliminary Hearing Testimony

Parker contends the trial court erred in admitting A.C.'s preliminary hearing testimony at the second trial because the prosecution failed to demonstrate due diligence in attempting to secure A.C.'s attendance at the second trial. He argues we must reverse count 1 for human trafficking A.C. and count 2 for pimping A.C. based on this claim of error.

We note that the trial court found A.C. to be unavailable as a witness at Parker's first trial as well.

28

### A.    Proceedings below

On November 20, 2016, during jury selection before the second trial, the trial court held a hearing to evaluate the prosecution's diligence in attempting to secure A.C.'s appearance at trial.  Krist Mason, a senior investigator at the Los Angeles District Attorney's Office Bureau of Investigations, testified as follows.

On April 30, 2019, the prosecutor requested Mason locate A.C. and personally serve her with a subpoena for the second trial.  Each time the trial date was continued, the prosecutor notified Mason, and Mason stopped her efforts to locate A.C., so as not to tip off A.C. and give her time to disappear before trial.  Detective Gore had told Mason that A.C. had become uncooperative.  Mason began a sustained effort to locate A.C. on October 7, 2019, a month and a half before this due diligence hearing.

Mason prepared a "workup" on A.C., using the name and date of birth that appeared on the trial subpoena she received from the prosecutor.  She also reviewed the police reports in this case.  To complete her workup, she conducted research using multiple law enforcement resources and databases.  She found A.C.'s Social Security number and various aliases (three different spellings of her first name) and used this information to search for A.C.  She checked hospitals in Los Angeles and Las Vegas.

Nothing in Mason's investigation indicated A.C. was in California; everything indicated A.C. was living in Las Vegas.  Mason found an address for A.C. on Flower Circle in Las Vegas, but her research revealed that A.C. stopped using that address in June 2019, several months before this hearing.

29

Mason discovered that A.C.'s family members were "active on Facebook."  A.C., however, had not been active on Facebook for a couple years.  Mason viewed family Facebook posts, showing recent photos of A.C. with her grandmother.  Mason determined that A.C.'s grandmother relocated from Las Vegas to Georgia about five weeks before this due diligence hearing.  Based on her investigation, Mason believed that A.C. lived with her grandmother in Las Vegas prior to her grandmother's relocation to Georgia.

Around the same time A.C.'s grandmother moved to Georgia, utilities were turned on in an apartment on Maule Avenue in Las Vegas in A.C.'s name.  Mason verified with the postal service that both A.C. and her mother received mail at this Maule Avenue apartment, and she assumed they lived there together.  Mason was unable locate a work address for A.C. or her mother or determine A.C.'s father's name.

Mason contacted investigators at a district attorney's office in Las Vegas and asked them to do a "door knock" at all addresses Mason found for A.C. in Las Vegas.  The Las Vegas investigators went to multiple addresses, including the Flower Circle address, and reported back to Mason.  They told her that at the Flower Circle apartment, the neighbors said they did not recognize A.C.'s photo; the building management reported that A.C. was not on the apartment lease and did not live there; and the occupant of the apartment, who had been living there for a while, reportedly did not recognize A.C.'s name.

According to Mason, the Las Vegas Police Department sent someone to do a door knock at the Maule Avenue apartment, and

the officer reported back to the district attorney's office.[16]  Mason learned that a woman answered the door at the Maule Avenue apartment and stated that A.C. did not live there.  Mason assumed this woman was A.C.'s mother and believed the woman was lying about A.C. not living there.  Mason did not have more specific information about what the officer did at the door knock (e.g., whether the officer showed A.C.'s photo to neighbors).  On a scale of 1 to 10, Mason's confidence level that A.C. lived at the apartment on Maule Avenue was a 10, based on the utilities being in A.C.'s name and A.C. and her mother receiving mail there.

Mason stated she was not authorized to conduct surveillance outside the Maule Avenue apartment in Las Vegas.  She explained that sometimes out-of-state investigators would conduct such surveillance for the Los Angeles District Attorney's Office as a courtesy.  She informed the prosecutor that she believed the Las Vegas authorities would locate A.C. if they conducted such surveillance.  Mason understood that the prosecutor was going to discuss the issue of surveillance with her contact in the Clark County District Attorney's Office in Las Vegas.  Mason did not know if such surveillance occurred.

Mason located two telephone numbers associated with A.C.  Between April and October 2019, Mason sent two texts and two voicemail messages to each number but did not receive a response from A.C.  Mason also sent several email and voicemail messages to A.C.'s mother and received no response.  Two days before this due diligence hearing, Mason left a voicemail message

_____

[16] It is not clear from Mason's testimony whether the Las Vegas Police Department officer reported back to the district attorney's office in Las Vegas or Los Angeles.

31

on a telephone number associated with A.C.'s grandmother and did not receive a response. Mason did not ask authorities in Georgia to do a door knock at the grandmother's house because all information Mason found indicated A.C. was living in Las Vegas.

After Mason testified, the prosecutor informed the trial court: "I filed this morning a declaration indicating the steps that I took to file the appropriate paperwork here in Los Angeles County and what I did in terms of coordinating with Las Vegas for that paperwork to be filed. There also is a declaration from the investigator with the Clark County District Attorney's Office indicating the steps that he took to locate [A.C.] and have her appear in court in Las Vegas to then be ordered to Los Angeles. [¶] I'd just note that this particular investigator went to all of the addresses identified by Ms. Mason including that Maule address, spoke to the manager and showed pictures of [A.C.] around the property, and all indications were that she did not live there and had not been seen recently. Because there was no confirmed lease for her in Las Vegas, the Las Vegas D.A.'s Office told me that the order to show cause hearing needed to be taken off calendar because there was not a witness to bring into court." The trial court marked these documents as Court's Exhibit 1 and considered the documents in evaluating the prosecution's diligence in attempting to secure A.C.'s appearance at trial, with no objection to the documents from Parker.

We have reviewed Court's Exhibit 1. The declaration from the investigator from the Clark County District Attorney's Office states, in pertinent part, that on October 30, 2019, he went to the Maule Avenue apartment. The apartment manager informed him that no one with a surname relevant to this case was on the

32

lease for the apartment. No one at the apartment building recognized A.C. as someone who had been on the property, based on the photo the investigator showed.

Defense counsel argued the prosecution did not show due diligence in attempting to secure A.C.'s attendance at trial because (1) the prosecution did not attempt to contact A.C. or her family members through the U.S. Postal Service and (2) no surveillance was conducted at the Maule Avenue apartment where Mason believed A.C. was living. The prosecution argued its efforts satisfied the due diligence standard.

The trial court ruled: "Having heard the arguments of both sides, the court feels there's more than sufficient evidence this witness is unavailable pursuant to [section] 240 of the Evidence Code. As the D.A. points out, they don't have to go to extraordinary means or all means, but they have to show due diligence, and that is a standard evaluated by this court. [¶] I find in reviewing the People's -- Court's Exhibit 1, the efforts [the] People made, they went through the court process. They went through law enforcement, D.A.'s office, investigators in Vegas. They used this -- the local investigator. They have searched numerous databases, and I think it's probably a fair assessment to say that she [A.C.] is evading service based on the facts and circumstances of this case in light of the fact that the defendant has already been convicted of [a Penal Code section] 136[.1] [violation for dissuading a witness] as to her, and she is most likely either in Vegas -- most likely if not in Vegas[,] temporarily knowing this case is pending[,] maybe in Georgia. We don't know. [¶] But I think the People have gone above and beyond what is necessary, and I do think it supports the court making a finding of unavailability."

33

## B. Applicable law and analysis

"A criminal defendant has a state and federal constitutional right to confront witnesses, but the right is not absolute.  If a witness is unavailable at trial and has given testimony at a previous court proceeding against the same defendant at which the defendant had an opportunity to cross-examine the witness, the previous testimony may be admitted at trial.  In a criminal case, the prosecution bears the burden of showing the witness is unavailable and, additionally, that it made a 'good-faith effort' [citation] or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial."  (*People v. Sánchez* (2016) 63 Cal.4th 411, 440 (*Sánchez*).)

This exception to the confrontation requirement is codified in the Evidence Code.[17]  (*People v. Herrera* (2010) 49 Cal.4th 613, 621.)  Under section 1291, "former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness" and the "party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."  (§ 1291, subd. (a)(2).)  A person is "unavailable as a witness" when he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or attendance by the court's process."  (§ 240, subd. (a)(5).)

" '[T]he term "due diligence" is "incapable of a mechanical definition," but it "connotes persevering application, untiring

---

[17] Undesignated statutory references are to the Evidence Code.

efforts in good earnest, efforts of a substantial character." ' [Citation.] Relevant considerations include the timeliness of the search, the importance of the witness's testimony, and whether leads were competently explored. [Citation.] The reviewing court defers to the trial court's determination of the historical facts if supported by substantial evidence, but it reviews the trial court's ultimate finding of due diligence independently, not deferentially." (*Sánchez, supra*, 63 Cal.4th at p. 440.)

Here, the prosecution conducted a timely and thorough search for A.C. All information discovered during the search indicated A.C. was living in Las Vegas. The prosecution cooperatively and appropriately worked with law enforcement in Las Vegas to follow up on all leads regarding A.C.'s whereabouts. Based on the information gleaned during the door knocks, Las Vegas law enforcement indicated it did not believe A.C. would be found at any of the known addresses. Mason left messages for A.C., her mother, and her grandmother, but no one returned her calls, texts, or emails.

Parker argues the prosecution did not make a good faith effort or exercise reasonable diligence in attempting to secure A.C.'s attendance at trial because the prosecution failed to conduct surveillance outside the Maule Avenue apartment. The Los Angeles County District Attorney's Office was not authorized to conduct surveillance in Las Vegas, as Investigator Mason acknowledged during her testimony. While Mason expressed her belief that A.C. could have been found through such surveillance, she acknowledged she did not know the extent of the efforts law enforcement made to find A.C. at the Maule Avenue apartment. For example, she did not know that an investigator from the Clark County District Attorney's Office, who provided a

35

declaration, spoke to management at the Maule Avenue apartment building and showed A.C.'s photo. That investigator learned no information indicating A.C. had been on the property. Neither A.C. nor her mother signed the lease. The fact A.C. received mail at the Maule Avenue apartment and had the utilities in her name does not mean she lived there. Evidence presented at trial demonstrated that A.C. maintained a residence in Las Vegas and received mail there while she was living in California and planning a future here with Parker. To the extent the prosecution did not ask Las Vegas law enforcement to conduct surveillance, we conclude this was reasonable in light of the circumstances as conveyed to the prosecution by Las Vegas law enforcement.

Parker also argues it was unreasonable for Investigator Mason to alert A.C. that the prosecution was looking for her, knowing she had become uncooperative, by sending her texts and voicemail messages. We disagree. A.C. was out of state, and the prosecution had no viable means of keeping tabs on her. Because the prosecution was not in contact with A.C. and had not confirmed where she lived, telephone numbers and email addresses were the most reliable contact information the prosecution had. It would have been unreasonable for Mason to forgo these leads. Mason testified that she only conducted her search for A.C. using these methods when there was a looming trial date. Whenever the trial date was continued, she suspended her search, so she would not alert A.C. too far in advance and give her time to disappear.

"A court cannot 'properly impose upon the People an obligation to keep "periodic tabs" on every material witness in a criminal case, for the administrative burdens of doing so would

be prohibitive.  Moreover, it is unclear what effective and reasonable controls the People could impose upon a witness who plans to leave the state, or simply "disappear" long before a trial date is set.' " (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.) " 'The law requires only reasonable efforts, not prescient perfection' " by the prosecution.  (*Ibid*.)  Here, the prosecution made good faith efforts and exercised reasonable diligence in attempting to secure A.C.'s appearance at trial.  The court did not err in declaring her unavailable and admitting her preliminary hearing testimony.

## II.    **Admission of A.C.'s Statements to Law Enforcement**

Parker contends the trial court erred in admitting into evidence at the second trial A.C.'s statements to law enforcement because no hearsay exception allowed the jury to consider the statements for their truth.  Parker never had an opportunity to cross-examine A.C. regarding her statements to law enforcement because the prosecution did not introduce the statements at the preliminary hearing.  He argues we must reverse count 1 for human trafficking A.C. and count 2 for pimping A.C. based on this claim of error.

As set forth above, one of the hearsay exceptions on which the trial court admitted A.C.'s statements to law enforcement is the doctrine of forfeiture by wrongdoing.  This doctrine "allows admission of unconfronted testimonial statements 'where the defendant ha[s] engaged in wrongful conduct designed to prevent a witness's testimony.' " (*People v. Reneaux* (2020) 50 Cal.App.5th 852, 865 (*Reneaux*); see also *Crawford v. Washington* (2004) 541 U.S. 36, 62 ["the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds"].)

To admit evidence under the doctrine of forfeiture by wrongdoing, the trial court must find "by a preponderance of the evidence that the defendant by a wrongful act made the witness unavailable with the intent of preventing the witness from testifying.  [Citation.]  The goal of the doctrine was to remove the 'otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them—in other words, it is grounded in "the ability of the courts to protect the integrity of their proceedings." ' " (*People v. Kerley* (2018) 23 Cal.App.5th 513, 549-550, citing *Giles v. California* (2008) 554 U.S. 353, 358-368, 374.)

In 2010, the California Legislature codified the doctrine of forfeiture by wrongdoing in section 1390 (Stats. 2010, ch. 537, § 2), providing:  "Evidence of a statement is not made inadmissible by the hearsay rule if the statement is offered against a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."  (§ 1390, subd. (a).)

"The underlying factual issues to be resolved by the trial court in applying the forfeiture by wrongdoing doctrine include: (1) whether by his wrongful conduct the defendant caused a witness to be unavailable to testify; and (2) whether the defendant intended to cause the witness to be unavailable." (*Reneaux, supra*, 50 Cal.App.5th at p. 865.)  "Whether a defendant's conduct constitutes 'wrongdoing' depends not necessarily on its character, but on the defendant's intent and whether his actions caused the witness not to appear." (*Id*. at p. 868.)  "This standard of wrongdoing is broad.  The defendant's affirmative act need not be criminal or even threatening.  Rather, the action becomes 'wrongdoing' because the defendant acted

38

with the intent to interfere with the court's truth-finding function and his action caused the witness not to appear." (*Id.* at p. 870.)

In reviewing the trial court's decision to admit evidence under the doctrine of forfeiture by wrongdoing, we "evaluate whether there is sufficient evidence from which the trial court could make its finding[s] on a preponderance [of the evidence] standard." (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1186 (*Merchant*).) "Although we apply a substantial evidence standard of review to the trial court's factual finding[s], '[w]e review for abuse of discretion the ultimate decision whether to admit the evidence.' " (*People v. Quintanilla* (2020) 45 Cal.App.5th 1039, 1050.)

We conclude substantial evidence supports the trial court's implied findings that Parker intended to cause A.C. to be unavailable at trial and, by his wrongful conduct (i.e., interfering with the court's process and dissuading a witness), did cause A.C. to be unavailable at trial. In the call Parker made to A.C. after the preliminary hearing,[18] he told her the only reason he was still in jail was because she testified at the preliminary hearing. She told him she did not want to testify, but Detective Gore "popped up" at her house at 3:00 a.m. to take her to the preliminary hearing. Parker faulted her for giving Detective Gore her address. A.C. did not seem to understand there would be a future trial at which witnesses would testify against Parker. She indicated she believed Parker had already been found guilty of all charges. Parker disabused her of this notion. A.C. told him she would not testify against him at trial. Parker explained to her in

---

[18] Parker does not challenge the trial court's admission into evidence of any of the calls he made from jail.

39

detail that if the prosecution could not locate her and did not personally serve her with a subpoena, she did not have to come to court and she would not get in trouble. A.C. told Parker she loved him, was "down for" him, and wanted to be with him when he was released from jail. Parker indicated he would be with her unless she continued to "entertain . . . these white people," meaning cooperate with law enforcement in this case. A.C. admitted to Parker that she was afraid of him based on the threats he had made to her in the past. She also indicated to Parker during the prior calls that she had received messages from numerous people, telling her Parker planned to hurt her and their baby when he was released from jail because he believed it was her fault he was in custody.

A.C. relocated to another state after this last call with Parker because she feared for her safety, and she stopped cooperating with the prosecution. Substantial evidence presented at the due diligence hearing (held the same day the trial court admitted these statements) indicates A.C. knew the prosecution was looking for her (through texts and voicemail messages to her and her family), and she was evading service of a trial subpoena. For example, Inspector Mason testified at the due diligence hearing that she was confident she reached A.C.'s grandmother's phone because A.C.'s grandmother identified herself on the voicemail.

The trial court did not abuse its discretion in admitting A.C.'s statements to law enforcement under the doctrine of forfeiture by wrongdoing. In sum, Parker told Burks he would tell A.C. whatever he had to tell her to ensure she did not testify against him. After the preliminary hearing, Parker instructed A.C. on how to avoid being served with a subpoena for her

testimony. She was expecting his child, and he manipulated her by indicating he would end his relationship with her if she continued to cooperate with law enforcement. The evidence also demonstrates he encouraged others to contact her to threaten her and dissuade her from testifying. Substantial evidence demonstrates that Parker's wrongful tactics worked—A.C. stopped cooperating with law enforcement—and Parker will not now be heard to complain that evidence should be excluded because he did not have an opportunity to cross-examine A.C. regarding such evidence, after he did whatever he had to do and said whatever he had to say to keep her out of court.

We are not persuaded by Parker's arguments regarding the limited number of jail calls and the length of time between the last call and the second trial. Substantial evidence shows Parker wanted A.C. to disappear from law enforcement's reach, and he figured out what to say to her to cause that to happen. We have no cause to disturb the trial court's ruling.

Because we conclude the trial court properly admitted A.C.'s statements to law enforcement under the forfeiture by wrongdoing doctrine, we need not address the other hearsay exceptions under which the prosecution argued the statements could be admitted.

## III. Sua Sponte Duty to Instruct on False Imprisonment

Parker contends misdemeanor false imprisonment (Pen. Code, § 236) is a lesser included offense of human trafficking under Penal Code section 236.1, subdivision (a), and the trial court erred in not instructing the jury sua sponte on misdemeanor false imprisonment. He argues we must reverse count 1 for human trafficking A.C. based on this claim of error.

41

Penal Code section 236.1, subdivision (a)—the human trafficking offense for which Parker was convicted—provides: "A person who deprives or violates the personal liberty of another with the intent to obtain forced labor or services, is guilty of human trafficking . . . ." Misdemeanor false imprisonment—the offense for which Parker now claims the trial court should have instructed the jury—is defined as "the unlawful violation of the personal liberty of another." (Pen. Code, § 236.)

" 'Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' [Citation.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 154, fn. 5.) A trial court errs if it fails to instruct "on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*Id.* at p. 162.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*Ibid.*) "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*Ibid.*) We apply a de novo standard of review in determining whether a trial court erred in not instructing the

42

jury on an asserted lesser included offense.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

The Attorney General disputes misdemeanor false imprisonment is a lesser included offense of human trafficking under Penal Code section 236.1, subdivision (a) and points out there are no published California decisions on this issue.  We also have found no published decisions resolving this issue.  However, we need not decide the issue.  There is insufficient evidence in the record demonstrating Parker only committed misdemeanor false imprisonment and not the human trafficking of A.C.

The evidence presented at trial established either (1) Parker was A.C.'s pimp, who took her identification, Social Security card, money, and phone, and beat her and threatened her so she would continue to work for him as a prostitute; or (2) Parker did not force A.C. to work as a prostitute, he held her identification and Social Security card because she asked him to, and she was always free to leave.  If the jury credited the evidence most favorable to Parker, he would not be convicted of *either* human trafficking A.C. or false imprisonment.  Because there was no substantial evidence that Parker was guilty of misdemeanor false imprisonment, but not human trafficking A.C., the trial court did not err in not instructing the jury sua sponte on misdemeanor false imprisonment.

## IV.    Admission of Evidence of W.S.'s Age
### A.    W.S.'s testimony

Parker contends the trial court erred in admitting trial testimony from W.S. and Detective Gore regarding W.S.'s age because the testimony lacked foundation.  He argues we must reverse count 8 for human trafficking a minor (W.S.) for commercial sex based on this claim of error.

W.S. testified that she was 19 years at the time of trial, she was born in January 2000, and she was 16 years old at the time she worked for Parker as a prostitute.  Parker objected to this testimony on lack of foundation grounds.

On appeal, Parker argues W.S.'s testimony regarding her own age "lacked any foundational showing her testimony was based on her own perception of the event of her birth."  He cites *People v. Montalvo* (1971) 4 Cal.3d 328 (*Montalvo*) in support of this proposition, but his reliance on this case is misplaced.  There, the defendant was convicted of the offense of furnishing a narcotic to a minor by a person 21 years of age or older, but the record included no "evidence or even mention of defendant's age."  (*Id*. at p. 332.)  The Attorney General argued "the burden of raising the issue of defendant's age may properly be placed upon defendant under the rule of necessity and convenience," but the Supreme Court disagreed and reversed the conviction.  (*Id*. at pp. 332, 334.)

The Court explained:  "The defendant may not necessarily have any substantially greater ability to establish his age than does the prosecution.  A defendant's precise age is not a matter within his personal knowledge but something he must have learned either from family sources or public or church records.  In this age of documented existence there is little doubt that ordinarily the prosecution may be able to secure evidence of the defendant's age.  Moreover, in those rare cases where there is no evidence of the defendant's precise age except his own belief as to what it is, the defendant might be as hard pressed as the prosecution to verify it.  If minority be deemed a defense, a defendant in such a case would be at the mercy of the jury's power to disbelieve his testimony even though it be the only

44

available evidence of age. We conclude that a case for the application of the rule of necessity and convenience here has not been made out." (*Montalvo*, *supra*, 4 Cal.3d at pp. 334-335.)

Here, there is evidence of W.S.'s age in the record—her testimony. The Supreme Court did not hold in *Montalvo* that a person's testimony regarding his or her age is *inadmissible*. Instead, the Court stated there is a danger to the proponent of such testimony that the jury will not believe it. Parker cites no authority indicating a trial court abuses its discretion when it allows a witness to testify to his or her own age. As *Montalvo* points out, the credibility of that testimony, like any other testimony, is a question for the jury.[19]

## B.    Detective Gore's testimony

Parker objected on lack of foundation grounds when detective Gore testified (1) that he confirmed W.S. was a minor during his January 11, 2017 interview with her; (2) that he learned during his investigation that W.S. was a minor; and (3) that W.S. was 16 years old during the events at issue in this case.

We need not evaluate the merits of this claim of error because, even assuming there was error, it is not reasonably probable Parker would have a obtained a more favorable result on count 8 if the trial court excluded Detective Gore's testimony

---

[19] Nor does Parker cite any authority supporting his argument that a person's testimony about his or her own age is inadmissible under section 702, subdivision (a), which provides: "Subject to Section 801, the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter. Against the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter."

regarding W.S.'s age.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  In light of W.S.'s testimony regarding her history of placements in juvenile facilities, we have no reason to believe the jury doubted the credibility of her testimony regarding her own age.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

FEDERMAN, J.[*]

---

[*] Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.